IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita Leeson Weinshienk

Civil Action No. 09-cv-00544-ZLW

CRAIG HORTH,

    Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

    Defendant.

_____

**ORDER**
_____

    Plaintiff appeals the September 11, 2008 written decision of Administrative Law Judge Larry M. Donovan (ALJ) denying Plaintiff's claim for Social Security Disability Insurance Benefits (DIB). The ALJ's decision was affirmed by the Appeals Council on January 30, 2009 (R. 1-3). This appeal was timely filed.

    This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The Court has determined that the appeal can be resolved on the parties' briefing and that no oral argument is necessary.

**BACKGROUND**

    **A.    Personal History, Alleged Disability, and Filing of Claims**

Plaintiff was born on January 21, 1959 (R. 28). Plaintiff is single, lives with his parents, and has completed twelfth grade. (R. 28, 30-31).

Plaintiff filed a DIB application on July 23, 2007, alleging a disability onset date of December 31, 2002. (R. 14). Plaintiff alleges the combination of the following conditions render him disabled: chronic fatigue immune dysfunction, primary fibromyalgia, seizures, and memory/concentration problems. (R. 42).

Plaintiff's date last insured for purposes of DIB was December 31, 2007. (R. 14). <u>Thus to receive DIB benefits, Plaintiff must show he was disabled between December 31, 2002 and December 31, 2007 and the impairment lasted twelve months or was expected to last twelve months.</u>[1]

Plaintiff's initial application was denied on December 4, 2007. (R. 40-44). Plaintiff timely filed a request for his case to be heard by an ALJ. (R. 45-50).

    **B.    Work History**

Plaintiff has not been employed since 2002. (R. 17). Plaintiff was self-employed as a farmer from 1977 until 2002. (R. 120, 136-41). Plaintiff described his job as "drove the tractor for about 10-11 hours per day, ran the combine, drove a truck to haul wheat to town, walked the fields and pulled the rye plants out of our fields, sprayed pesticides,

---

[1] 42 U.S.C. § 416(i)(1); 20 C.F.R. § 404.1505(a).

did the books for the farm, [and] did mechanical work fixing up all of the machinery." (R. 105). Plaintiff claimed he stopped working because he had 8-46 seizures daily, "can't lift over 3 lbs., have lack of concentration, have difficulty removing waste, [s]leep at least 8 hours per night and then sleep an additional 8 hours during the day, [and] have stiffness and trouble with mobility." (R. 104).

### C. Medical History

The pertinent medical evidence is summarized as follows.[2] In May 2001, Plaintiff complained of decreased vision and pain in his left eye. (R. 245). Beginning in September 2001, he began chelation therapy treatments. (R. 160-84). At these appointments, Plaintiff complained of temporary paralysis and severe muscle weakness that he said began in 1977. (R. 170, 174).

On September 12, 2005[3] Plaintiff complained to Dr. Martin McDermott, M.D. of generalized aches, pain, and fatigue – a problem he reported having intermittently for

---

[2]Plaintiff objects that various medical records submitted to the agency, many dating from the 1970's, were improperly disregarded on the grounds that only recent records were necessary. The Court overrules this objection. The crucial inquiry in DIB cases is what limitations Plaintiff was experiencing during the alleged period of disability. *See* Hargis v. Sullivan, 945 F.2d 1482, 1493 (10th Cir. 1991) (*citing* Johnson v. Heckler, 767 F.2d 180, 183 (5th Cir. 1985)) ("the proffered evidence [must] relate to the time period for which the benefits were denied."). The submitted medical records do not provide any help in this regard: it is not critical whether Plaintiff was previously diagnosed with fibromyalgia and/or chronic fatigue syndrome, but which physical manifestations of that diagnosis were occurring during the time frame at question. *See* 20 C.F.R. § 404.1512(d) (records normally required only for the twelve months prior to filing of a DIB application).

[3]Between December 31, 2002, Plaintiff's alleged disability onset date, and September 2005, Plaintiff either did not seek medical treatment or those records were not provided.

years. (R. 192). Dr. McDermott thought Plaintiff seemed somewhat disabled intellectually; however, Plaintiff's physical examination was normal. (R. 192).

On September 28, 2005, Plaintiff reported having seizure-like episodes to Dr. McDermott. (R. 191). He said he had fallen the day before and had been falling a lot over the past month. (R. 192). His physical examination was normal, and Dr. McDermott indicated that Plaintiff might be over-medicated for his thyroid condition. (R. 191). Dr. McDermott ordered a series of tests related to the seizure-like episodes, including a bilateral carotid doppler ultrasound, a twenty-four hour heart monitor test, a magnetic resonance image (MRI) of the brain, and an electroencephalogram (EEG) test. (R. 232-36). All tests results were normal. (R. 191, 232-36).

On October 13, 2005, Plaintiff reported that he had "16 black outs" the day before. (R. 191). Dr. McDermott started Plaintiff on Tegretol (a medication used to treat seizures, nerve pain, and bipolar disorder) despite the negative test results. (R. 191).

In November 2005, Dr. McDermott noted that the Tegretol was not effective and that Plaintiff still reported incidents where he "kind of collapses, does not lose consciousness and can still hear" and would be "sort of paralyzed for periods of anywhere from 10-30 minutes." (R. 189-90). Plaintiff reported that these spells started when he was 18 years old, had been evaluated at numerous other clinics, and that no one ever found anything wrong with him. (R. 190). Dr. McDermott found Plaintiff's symptoms difficult to assess, and indicated that possible diagnoses might include vasogagal symptoms (a usually harmless condition that results when a trigger causes a

sudden drop in heart rate and blood pressure, which reduces blood flow to brain and causes a brief loss of consciousness), pseudoseizures (a physical manifestation of an emotional disturbance that resembles an epileptic seizure but is not caused by electrical disruptions in the brain), or conversion reaction (a psychopathological condition characterized by the presence of bodily symptoms having no discernible physical cause but for which there is evidence of a psychological conflict). (R. 190). Plaintiff's physical examination remained normal. (R. 190). Dr. McDermott stopped the Tegretol and started Plaintiff on Cymbalta (a drug used to treat major depressive disorder, general anxiety disorder, and fibromyalgia). (R. 190).

In January 2006, Dr. McDermott discontinued the Cymbalta due to its ineffectiveness, increased Plaintiff's dose of Topamax (a drug used to prevent seizures and migraine headaches), and speculated that Plaintiff's condition might be a conversion reaction or perhaps a form of narcolepsy or cataplexy. (R. 189).

Between March 2006 and October 2007, Plaintiff received acupuncture and massage therapy treatments for abdominal, bowel, and urinary complaints (R. 207-27). On October 16, 2006, therapist Jeffrey Gappa noted that Plaintiff experienced a ten minute petit mal episode while at his appointment,[4] that Plaintiff was groggy but stable following the episode, and Plaintiff was able to proceed with the acupuncture treatment. (R. 220).

---

[4]Dr. McDermott also reported witnessing a seizure-like episode on September 29, 2008. (R. 259). Dr. McDermott reported that Plaintiff collapsed to the floor, did not twitch or convulse during the episode, was fully conversant, and after the three minute episode Plaintiff stood on his own unassisted. (R. 259).

5

In July 2006, Jonathan D. Medina, M.D., Dr. McDermott's partner, opined that although Plaintiff had several diagnoses – including history of hypertension, chronic fatigue syndrome, fibromyalgia, and seizure or pseudoseizure episodes – all of these conditions were under good control on medication with the exception of the pseudoseizures. (R. 229). Dr. Medina indicated that the etiology of these spells was unclear, and that a thorough neurological, cardiac and vascular work-up revealed no pathology explaining this condition (R. 229).

In October 2006, Dr. McDermott indicated that he was doubtful of Plaintiff's need for thyroid medication. (R. 188). Other than observing Plaintiff sweating and reports that he felt cold, Plaintiff's physical examination was normal. (R. 188).

Plaintiff next saw Dr. McDermott following a nose bleed in March 2007. Dr. McDermott noted that Plaintiff was "somewhat hypertensive" and started him on blood pressure medication. (R. 188).

In April 2007, Dr. McDermott noted Plaintiff's blood pressure was acceptable and Plaintiff was having no side effects from the blood pressure medication. (R. 186). However, Dr. McDermott increased Plaintiff's dose of the blood pressure medicine in August 2007. (R. 185). He also refilled Plaintiff's thyroid medication, although he again noted that Plaintiff probably did not need this medication. (R. 185) Although he speculated that Plaintiff might have some form of chronic underlying personality disorder, he indicated that he had not been able to identify the nature of this disorder. (R. 185).

In November 2007, Maximilian Wachtel, Ph.D., a licensed psychologist, conducted a psychological examination. Plaintiff reported that he has seizures "from time to time" and that he had struggled with chronic fatigue syndrome and fibromyalgia for thirty years. (R. 247). He said it hurt to sit or stand for any length of time. (R. 247). Dr. Wachtel's mental status examination revealed that Plaintiff was oriented to person, place, time, and situation; had normal affect; had logical and coherent thought processes; and was able to pay attention and maintain concentration through the interview and testing. (R. 246-47). Plaintiff's intelligence was in the low-average to average range, and his memory was not impaired. (R. 246-47). Dr. Wachtel concluded that Plaintiff's work-related abilities were not impaired by mental illness, although "his pace seems to be severely impaired as measured by the WAIS-III." (R. 252). He assigned Plaintiff a current global assessment of functioning (GAF) score of 55, indicating moderate symptoms or difficulties in social, occupational, or school functioning. (R. 252).

On November 26, 2007, Robert Brill, Ph.D., completed a Psychiatric Review Technique form in which he concluded that Plaintiff's mental impairments were not severe. (R. 145). Dr. Brill indicated that Plaintiff had mild restrictions of activities of daily living and mild difficulties in maintaining concentration, persistence, and pace, but no difficulties in maintaining social function and no episodes of decompensation. (R. 155). He noted that the medical evidence did not support Plaintiff's alleged limitations in memory and concentration. (R. 157). Although Dr. Brill acknowledged that Dr.

Wachtel's report showed limitations in working pace, Dr. Brill indicated that Plaintiff's better scores in other areas would compensate for this deficiency. (R. 157). Dr. Brill concluded that "[a]lthough there appears to be somatoform and characterological features to the case, these aspects of the claimant [sic] medical condition are not severe (e.g., not noticed or apparent in the thorough [consultative exam]). . . . The claimant's mental condition in isolation . . . will not significantly limit the ability to work." (R. 157).

John Mars, M.D., conducted a physical examination of Plaintiff on November 26, 2007. Plaintiff reported that he had tried numerous medications, none of which had helped, although he said that drinking Coca-Cola (both regular and decaffeinated) seemed to help his symptoms. (R. 253). He reported that he was not on an exercise program and was not currently taking any medications. (R. 254). He described the pain in his neck as a six out of ten but said that his other joints were "not too bad." (R. 254). He also reported that he had been having eight seizures per day for approximately six years. (R. 254). He said that the seizures caused him to fall but not lose consciousness, lasted anywhere from a few minutes to an hour, and that he felt okay afterwards (other than feeling slightly dazed). (R. 254). He indicated that he could walk about one mile without needing to rest and could sit for twenty minutes unrestricted. (R. 254).

After examining Plaintiff, Dr. Mars noted inconsistencies in Plaintiff's physical exam and observed that he did not have the typical tender points of fibromyalgia. (R.

8

255-56). Rather, he had more generalized superficial tenderness over the neck, mid-back, and lower back. (R. 256). He had no atrophy, good strength, and normal gait. (R. 256). Dr. Mars concluded that there was nothing from his examination or from the medical records that would prevent Plaintiff from working and Plaintiff had no restrictions with regard to lifting, carrying, sitting, standing, walking, handling, climbing, balancing, stooping, kneeling, crouching, or crawling. (R. 256).

### D.    The Administrative Hearing (R. 22-39)

The administrative hearing was held via videoconferencing on July 28, 2008. Plaintiff was unrepresented at the hearing.[5] The following individuals testified: Plaintiff and Dr. Michael Enright. Plaintiff's father attended as an observer.

Plaintiff testified that he currently was living with his parents, was not actively looking for work, and had not operated a motor vehicle in two years. He described his typical day which consisted of waking at 6 A.M., eating breakfast, reading the newspaper, working on the computer, and then sleeping for another two hours. He then wakes up, eats lunch, and return to sleep for two hours. After waking up, he walks a quarter mile to retrieve the mail, sleeps for two hours, and eats dinner around 6 P.M. He then watches television until 9 P.M. when he retires for the evening. He reported only occasionally helping with household chores. He rarely leaves the house. He

---

[5]Plaintiff waived his right to counsel via written form signed July 28, 2008. (R. 79).

attends no social activities, has no hobbies, does no yard work, has no friends, and does not dine out. (R. 27-39).

Dr. Enright was a clinical psychologist under contract with the Social Security Administration to provide mental health evaluations. Dr. Enright testified that after reviewing the record, it appeared that claimant suffers no medically determinable psychiatric impairment. (R. 26).

### E. The ALJ's Decision (R. 14-21)

The ALJ's written decision proceeds through the first two steps of the sequential analysis. The ALJ determined Plaintiff was not disabled as defined by the Social Security Act and denied Plaintiff's application for DIB. (R. 21).

At step one the ALJ determined Plaintiff had not engaged in substantial gainful employment activity during the alleged period of disability. (R. 17). At step two the ALJ determined that Plaintiff's impairments were not severe. (R. 17). The ALJ primarily relied on the opinions of multiple physicians (including treating-source physicians) that found no medically determinable impairments. (R. 19-20). The ALJ also found persuasive the lack of physical findings, the long history of substantial gainful activity performed while Plaintiff was allegedly under the alleged impairments, and discrepancies in Plaintiff's description of his ailments that hurt his credibility (R. 19-20).

## ANALYSIS

### A. Standard of Review

When a district court reviews the Commissioner's decision to deny Social Security benefits the Court's only job is to determine whether the Commissioner's factual findings are supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.[6] Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[7] Since review is based on the record as a whole, the entire record must be examined to determine whether the evidence supporting the decision is substantial, taking "into account whatever in the record fairly detracts from its weight."[8] However, the Court may neither reweigh the evidence nor substitute its discretion for that of the ALJ.[9]

### B. Determination of Disability

An individual

> shall be determined to be under a disability only if [her] physical or mental . . . impairments are of such severity that [she] is not only unable to do [her] previous work but cannot,

---

[6] Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).

[7] Id.

[8] Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004) (quoting Washington v. Shalala, 37 F.3d 1437, 1439 (10th Cir. 1994)).

[9] White v. Massanari, 271 F.3d 1256, 1257 (10th Cir. 2001).

considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.[10]

Disability requires more than the mere inability to work without pain.[11]

Whether a person has a "disability" supporting entitlement to DIB is determined using a five-step sequential evaluation process, which considers whether the claimant:

(1) worked during the alleged period of disability;

(2) has a severe impairment;

(3) has a condition which met or equaled the severity of a listed impairment;

(4) can return to his or her past relevant work; and

(5) if not, whether he or she can perform other work in the national economy.[12]

If a determination can be made at any step, it is not necessary to proceed to the next step of the analysis.[13]

---

[10] 42 U.S.C. § 423(d)(2)(A).

[11] *See* Ray v. Bowen, 865 F.2d 222, 225-26 (10th Cir. 1989).

[12] 20 C.F.R. § 404.1520(a)(4) (2008); *see* Williams v. Bowen, 844 F.2d 748, 750-51 (10th Cir. 1988). The claimant bears the burden of establishing a prima facie case of disability at steps one through four. Id. at 751, n.2. If claimant is successful, the burden of proof falls on the Commissioner to establish the requirements of step five. Id. at 751.

[13] 20 C.F.R. § 404.1520(a)(4).

A severe impairment is one that "significantly limits your physical or mental ability to do basic work activities."[14] Basic work activities means "the abilities and aptitudes necessary to do most jobs."[15] This includes:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and
> (6) Dealing with changes in a routine work setting.[16]

### C. Plaintiff's Arguments

Plaintiff has two primary arguments. First, Plaintiff argues that the ALJ erred when he did not find Plaintiff's fibromyalgia and chronic fatigue syndrome, either alone or in combination, to constitute a severe impairment. Second, Plaintiff argues that the ALJ erred when he did not find his pseudoseizures were a severe impairment.

First, Plaintiff claims that the ALJ erred when he did not consider old medical records that allegedly show that Plaintiff was definitively diagnosed with fibromyalgia and/or chronic fatigue syndrome. This Court has previously discussed the relevance of

---

[14] 20 C.F.R. § 404.1520(c).

[15] 20 C.F.R. § 404.1521(b).

[16] Id.

these medical records.[17] In short, whether Plaintiff was previously diagnosed with a specific medical condition is irrelevant.[18] Rather, what is relevant is if the physical manifestations of this condition, during the time period of alleged disability, rise to the level of a severe impairment as defined by the Social Security laws. These old medical records do not help in this regard, so the ALJ's decision to disregard them is not reversible error.

Assuming that Plaintiff does have fibromyalgia and/or chronic fatigue syndrome, these conditions have been present since the late 1970's-early 1980's when he first sought treatment. However, Plaintiff performed substantial gainful activity from this time until 2002.[19] There is no credible medical evidence that these conditions became substantially worse after 2002. Conversely, the medical evidence shows the opposite. For example, Plaintiff did not seek treatment for two and a half years between 2002-2005, and when he finally did seek treatment his treating-source physicians could find no significant medical evidence of a disability.[20]

---

[17] *See* supra note 2.

[18] "The claimant must show more than the mere presence of a condition or ailment." Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997) (*citing* Bowen v. Yuckert, 482 U.S. 137, 153 (1987)).

[19] *See* Cowan v. Astrue, 552 F.3d 1182, 1191 (10th Cir. 2008) (evidence that a claimant previously worked with impairment is substantial evidence that ALJ can use when making credibility determination as to the claimant's present declarations that he is disabled).

[20] While true that fibromyalgia can be a difficult condition to diagnose, *see, e.g.*, Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996), Plaintiff did not exhibit even the typical fibromyalgia tender points. (R. 20, 256).

14

The Court agrees with the ALJ that the application for disability benefits (R. 204-05), which indicated that Plaintiff would be unable to work for more than six months due to fibromyalgia and pseudoseizures, was not persuasive evidence for the multitude of reasons listed in the ALJ's order. (R. 19).

Plaintiff also argues that Dr. Wachtel's statement that Plaintiff's pace "seems to be severely impaired as measured by the WAIS-III," along with other statements made by Dr. Wachtel about Plaintiff's below average psychiatric testing results, indicate that Plaintiff has a disability. However, this argument ignores that Dr. Wachtel specifically states that Plaintiff's "work-related abilities are not impaired by a mental illness," and notes that "[a]ny claims regarding potential impairments . . . based on physical ailments are beyond the scope of this evaluation." (R. 252). Thus, the only treating source mental evaluation present in the record indicates that Plaintiff is not disabled, at least with respect to mental capacity.

Finally, Plaintiff argues that his pseudoseizures constitute a medically determinable severe impairment. However, none of Plaintiff's treating or examining physicians opined as to any specific functional limitations caused by his alleged pseudoseizures, much less limitations that would significantly affect his ability to perform basic work activities.[21] Additionally, the ALJ explained his reasons for discounting Plaintiff's own testimony as to the frequency and severity of these pseudoseizures by noting inconsistencies in the claimant's statements regarding his

---

[21] See, e.g., Kelley v. Chater, 62 F.3d 335, 338 (10th Cir. 1995) (no physician opining that claimant is disabled is substantial evidence).

symptoms and limitations.[22] The Court agrees with the ALJ that Plaintiff did not meet his burden of establishing that any of his medical conditions were a severe impairment during the claimed disability period.[23]

The Court finds the remainder of Plaintiff's objections are without merit.

**ORDER**

Accordingly, it is

ORDERED that the September 11, 2008 written decision of Administrative Law Judge Larry M. Donovan is affirmed. It is

FURTHER ORDERED that the Complaint and cause of action are dismissed with prejudice. It is

FURTHER ORDERED that the parties shall pay their own costs and attorney's fees.

DATED at Denver, Colorado, this 23rd day of July, 2010.

BY THE COURT:

/s/ Zita Leeson Weinshienk
_____
ZITA LEESON WEINSHIENK, Senior Judge
United States District Court

---

[22] *See* Shepherd v. Apfel, 184 F.3d 1196, 1202 (10th Cir. 1999) (ALJ's credibility determination supported by claimant's inconsistent testimony).

[23] At step two of the sequential evaluation process, a claimant bears the burden to "demonstrate an impairment or combination of impairments that significantly limits [his] ability to do basic work activity." Hawkins v. Chater, 113 F.3d 1162, 1169 (10th Cir. 1997) (*citing* 20 C.F.R. § 404.1520(c)).